```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION
```

TOSHA SIMS LEE, individually       §
and in her capacity as the         §
representative of the              §
ESTATE OF ROSIE SIMS, et al.,      §
                                   §
               Plaintiffs,         §
                                   §
VS.                                § Civil Action No. 3:07-CV-1298-D
                                   §
LUPE VALDEZ, in her                §
official capacity                  §
as Sheriff of Dallas County,       §
et al.,                            §
                                   §
               Defendants.         §

## MEMORANDUM OPINION AND ORDER

Plaintiffs move for leave to amend their complaint[1] under Fed. R. Civ. P. 16(b)(4) and 15(a)(2). Concluding that they have demonstrated good cause to amend the complaint after the deadline established by the scheduling order, the court grants the motion.

I

After being diagnosed in 1972 with paranoid schizophrenia, Rosie Sims ("Sims") spent the next 30 years in and out of a state

---

[1] Plaintiffs labeled their complaint an "original complaint," but this is a misnomer under federal procedure. The term "original" probably emanates from Texas state procedure. *See* Tex. R. Civ. P. 46 (referring to "original petition"). Federal procedure, however, does not use the term when referring to a complaint. *See* Fed. R. Civ. P. 7(a)(1) ("Only these pleadings are allowed: (1) a complaint[.]"). Accordingly, in this memorandum opinion the court will refer to plaintiffs' "original complaint" as their "complaint."

hospital.[2] In February 2002 Sims was detained at the Dallas County Jail ("Dallas Jail"). When the Dallas Jail receives a mentally ill detainee whom it cannot adequately treat, it is the Dallas Jail's official policy to send these inmates to a public hospital. The Dallas Jail also has a special area in which inmates who suffer from mental illnesses are detained (the "West Tower"). When Sims was initially screened in February 2002, a Dallas Jail guard noted that she was "bizarre" and "psychotic." Despite these observations and the county's extensive documentation of Sims's mental illness, she was neither sent to a public hospital nor to the West Tower, but was instead placed in a part of the Dallas Jail that houses general population inmates (the "North Tower"). Based on a medical expert's recommendation, a state judge soon declared Sims incompetent to stand trial. The judge sent Sims to a state mental health facility, Vernon State Hospital, where she remained for almost one year before she pleaded guilty to the criminal charge for which she was originally incarcerated. Because Sims had already served her term of incarceration, she was released.

A few months later (October 2003), Sims was again detained at the Dallas Jail. Once again, jail officials assigned her to the North Tower, which houses general population inmates. A few months

---

[2]Plaintiffs' motion requires that the court construe the scope of their complaint and proposed amended complaint. The court therefore accepts the allegations in these pleadings as true for purposes of deciding this motion.

later, based on an expert medical opinion, a state judge again declared Sims incompetent to stand trial, and she returned to Vernon State Hospital.

In May 2004 Sims returned to the Dallas Jail to await trial. After conducting another intake evaluation of Sims, Dallas Jail officials placed Sims in the general population housed in the North Tower, despite the County Jail's notice of Sims's paranoid schizophrenia. In 2005 Dallas Jail officials received signs of Sims's failing health, but there was no change in the medical attention provided to her.

In November 2005 inmates with whom Sims lived alerted Dallas Jail guards that she was having a seizure and had fallen out of her bunk. Three guards responded to the call and observed that Sims was on the floor of her cell. One guard ordered Sims to get up. Sims told the guard that she wanted to see the nurse, but she needed to change her clothes first because she had soiled them. During the time when Sims sat on her bed and attempted to change her clothes, the three guards heckled and laughed at her, telling Sims that she was taking too long and that they would not take her to the nurse if she did not hurry up. Two more guards arrived at Sims's cell, and one of them called a Dallas Jail nurse, who advised the guards to bring Sims to her. In the meantime, Sims laid back down on her bed, unable to continue changing. The guards asked her to get up so they could go to the nurse. Sims responded

in an incoherent mumble.  One guard then told the nurse that Sims was just tired, even though that guard had not understood anything Sims had said.  The nurse instructed the guard to bring Sims to her only if Sims wanted to go.  The nurse did not assess Sims's condition, and Sims was not taken to the infirmary.  Sims died hours later of bronchopneumonia in association with cardiac hypertrophy of undetermined etiology.

Tosha Sims Lee, individually and in her capacity as the representative of the estate of Sims, Archie Sims, Jr., and Melissa Lomack sue Dallas County for damages and injunctive relief under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("Rehabilitation Act"), and chapter 121 of the Texas Human Resources Code.  Plaintiffs also sue Dallas County and various Dallas Jail officials (guards and a nurse) who participated in the events leading to Sims's death.  They allege a claim under 42 U.S.C. § 1983 for violations of Sims's Fourteenth Amendment rights. With respect to their § 1983 claim, plaintiffs sue the Dallas Jail official defendants for damages, but they only seek injunctive relief against Dallas County.  Plaintiffs now request leave to amend their complaint to add a claim against Dallas County for damages under § 1983.

II

The court entered a scheduling order that set February 1, 2008 as the deadline for a party to file a motion for leave to amend the

pleadings.  Thus plaintiffs' motion to amend their complaint—which was filed after the February 1, 2008 deadline—implicitly requests that the court amend the scheduling order.

When the deadline to amend pleadings has expired, a court considering a motion to amend must first determine whether to modify the scheduling order under the Rule 16(b)(4) good cause standard.  *See S & W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003); *Am. Tourmaline Fields v. Int'l Paper Co.*, 1998 WL 874825, at *1 (N.D. Tex. Dec. 7, 1998) (Fitzwater, J.).  If the movant satisfies the requirements of Rule 16(b)(4), the court must next determine whether to grant leave to amend under the more liberal standard of Rule 15(a)(2), which provides that "[t]he court should freely give leave when justice so requires."  Rule 15(a)(2); *see S & W Enters.*, 315 F.3d at 536; *Am. Tourmaline Fields*, 1998 WL 874825, at *1.

The court assesses four factors when deciding whether to grant an untimely motion for leave to amend: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice."  *S & W Enters.*, 315 F.3d at 536 (internal quotation marks and brackets omitted).

III

Before analyzing the Rule 16(b)(4) factors, the court must determine the scope of plaintiffs' proposed amendments, which the parties dispute and which will inform the court's reasoning in granting or denying leave to amend. The proposed amended complaint differs from the complaint in two respects. First, the proposed amended complaint clearly adds a request for money damages against Dallas County under § 1983. Second, the § 1983 claim alleged in the proposed amended complaint includes the following additional paragraph:

> Defendant Dallas County maintained a policy, practice and custom of denying inmates in the jail, like Mrs. Sims, medical attention for their serious medical needs. Dallas County, acting with deliberate indifference, failed to hire adequate medical staff, failed to adequately fund medical care, failed to adequately train security staff in assisting inmates with serious medical problems, failed to provide conditions in compliance with state and federal law, and implemented policies and procedures which prevented Mrs. Sims from receiving care for her serious medical conditions. These practices, policies or customs constituted cruel and unusual punishment in violation of Mrs. Sims' Fourteenth Amendment rights. Defendant Dallas County is sued for compensatory damages.

Proposed Am. Compl. ¶ 51.

Defendants[3] characterize plaintiffs' original § 1983 claim as

---

[3]The court refers to "defendants" collectively as all defendants except Helen Ashley, who was the only defendant not to join the opposition brief.

a classic pretrial detainee episodic act or omission claim and contend that the proposed amended complaint attempts to add a conditions of confinement theory of relief not contained in the complaint. Plaintiffs posit that the complaint contains both an episodic act or omission claim and a conditions of confinement claim. Under plaintiffs' reading, the proposed amended complaint seeks additional relief—money damages—on the § 1983 claim against Dallas County, but it does not state any additional theories of liability. Whether plaintiffs' § 1983 claim is premised on an episodic act or omission theory or a conditions of confinement theory affects the applicable standard by which their constitutional claims for inadequate medical care are assessed. *See Flores v. County of Hardeman*, *Tex.*, 124 F.3d 736, 738 (5th Cir. 1997) (citing *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc)).

A

A pretrial detainee can allege a § 1983 claim for a Fourteenth Amendment due process violation arising from the conditions of confinement by pleading facts that support the finding that he was subjected to jail conditions that were not reasonably related to a legitimate governmental objective. *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

> In an episodic act or omission case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act or omission by the actor, and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.

*Palo v. Dallas County,* 2007 WL 2140590, at *4 (N.D. Tex. July 26, 2007) (Fitzwater, J.) (internal quotation marks omitted) (quoting *Stephens v. Dallas County, Tex.*, 2007 WL 34827, at *5 (N.D. Tex. Jan. 4, 2007) (Kinkeade, J.)). An instructive example of an episodic act or omission case is found in *Scott v. Moore,* 114 F.3d 51 (5th Cir. 1997) (en banc). In *Scott* the Fifth Circuit concluded that although the plaintiff had generally complained of Jail conditions that permitted an officer on duty to sexually assault her, "the actual *harm* of which she complain[ed] [was] the sexual assaults committed by [the defendant] during the one eight-hour shift—an episodic event perpetrated by an actor interposed between Scott and the city, but allegedly caused or permitted by the aforesaid general conditions." *Id.* at 53. The panel held that because "Scott did not suffer from the mere existence of the alleged inadequate staffing, but only from Moore's specific sexual assaults committed on but one occasion," the claim was properly treated as an act or omission claim and analyzed under the framework articulated in *Hare*. *Id.* at 53-54.

As this court has previously explained, a condition of confinement claim based on inadequate medical treatment differs

from an episodic act or omission claim because, unlike in *Scott*, it "does not focus solely on the acts or omissions of the staff on duty at the Jail. Rather, [it] also attacks the Jail medical care system itself." *Palo,* 2007 WL 2140590, at *4. "In *Scott* the plaintiff would not have been sexually assaulted had it not been for the actions of the guard[,]" but in a condition of confinement case, a plaintiff alleges that "the inadequate system of medical care caused him to suffer a deprivation of his constitutional rights." *Id.*

B

By focusing on the individual acts and omissions of the Dallas Jail guards and nurse who participated in the events leading to Sims's death in November 2005, plaintiffs' complaint certainly attempts to hold these individuals, as well as Dallas County, liable under an episodic act or omission theory. But

> [t]he individual acts or omissions of prison officials and staff are immaterial to [plaintiffs'] claim that the jail conditions themselves—specifically, the inadequate system of care in the Jail to which [Sims] was subjected during [her] pretrial confinement—violated [her] constitutional right to be free from punishment while confined as a pretrial detainee.

*Id.* at *5.

Plaintiffs aver:

> Pursuant to 42 U.S.C. § 1983, Plaintiffs claim the policy, practice and custom of Dallas County, through its Sheriff, supervisors, doctors, nurses, directors, and guards, by

- 9 -

> failing to train, supervise, or reprimand officers, nurses, doctors, and subordinates to recognize and respond to serious medical conditions at the Dallas County Jail was the moving force behind the violations of Mrs. Sims' Fourteenth Amendment rights.

Compl. ¶ 4. After discussing the intake evaluation process by which Sims was placed in the North Tower rather than the West Tower or a public hospital, the complaint alleges: "It is the practice and custom of Dallas County to ignore [its policies concerning screening of mentally ill detainees] and to provide a deliberately indifferent level of care for sever[ely] mentally ill inmates such as Mrs. Sims[.]" Compl. ¶ 23. The complaint continues its allegations concerning the inadequacies of the Dallas Jail screening process: "The reception screening and housing process at the Dallas County Jail is deliberately indifferent to inmates' serious mental illnesses[.]" *Id.* at ¶ 24. Quoting a 2005 U.S. Department of Justice ("DOJ") report, the complaint describes the Dallas Jail screening process as "ineffective" and avers that Dallas Jail officials "receive no training to screen." *Id.* (internal quotation marks omitted). The complaint supports its ineffective screening and training claims by citing a report by the Texas Commission on Jail Standards ("TCJS").

The complaint later alleges that "[t]he records further indicated Mrs. Sims had been in the Dallas County Jail for over a year without Dallas County ever providing her a physical. A bad case of pneumonia, such as the one that killed Mrs. Sims, should

have been detected by conducting a routine physical." *Id.* at ¶ 31.

> The Dallas County Jail is infamous for its dismal medical and mental health programs. According to the [DOJ] report, a clear "policy and procedure" should exist for the medical program. None of the Dallas County Jail staff interviewed for the report acknowledged that there was a policy and procedure manual, and some senior staff did not know one existed. The jail has failed state inspections by the [TCJS] every year for the past four years. A clear practice and custom of deliberate indifference to inmates' serious medical needs existed at the jail.

*Id.* at ¶ 36.

The complaint alleges that "[t]he Dallas County Jail is deliberately indifferent to inmate sick calls." *Id.* at ¶ 37. The complaint cites a TCJS report stating that "efficient and prompt care is not being provided for sick calls." *Id.* (internal quotation marks omitted). The complaint also quotes the following from a DOJ report: "[T]he process of officers handling sick call requests, particularly in the North Tower, is not optimal and may be a barrier to inmates getting their request to health care staff." *Id.* (internal quotation marks omitted). It may be inferred from the complaint that the Dallas Jail's inadequate responses to sick calls has been caused by its lack of proper staffing.

> According to the [DOJ], medical care of seriously ill patients is managed by nurses and physician's assistants who are either not trained to do so, or are less well trained and cannot be expected to adequately manage these types of conditions. There is virtually no

> physician supervision of medical care provided by nurses, nurse practitioners, or physician assistants. This is a dangerous practice. Further, in the North Tower, where Mrs. Sims spent her entire stay in the jail, there is no acceptable place to examine patients. The [DOJ] report concluded that with respect to sick calls in the Dallas County Jail, the system suppresses utilization by virtue of its multiple barriers to access.

*Id.* (internal quotation marks omitted). Finally, the complaint avers: "By refusing to treat and provide accommodation for her schizophrenia, Dallas County prevented Mrs. Sims from accessing appropriate medical care programs at the jail. The lack of access to medical care caused Mrs. Sims' death." *Id.* at ¶ 40.

The complaint alleges a § 1983 conditions of confinement claim against Dallas County. *See Shepherd v. Dallas County, Tex.*, 2008 WL 656889, at *5 (N.D. Tex. Mar. 6, 2008) (Fitzwater, C.J.) (holding that plaintiff's complaint pleaded § 1983 conditions of confinement claim based on similar allegations). Furthermore, the specific conditions of confinement about which plaintiffs complain in ¶ 55 of the proposed amended complaint—the only amended paragraph—are not different from those highlighted in the complaint. The only specific conditions of confinement arguably added in the proposed amended complaint are that Dallas County failed to adequately fund medical care and failed to provide conditions in compliance with state and federal law. Funding or lack of funding may affect certain conditions of confinement, but it is not itself a condition of confinement. And the latter

condition—concerning compliance with state and federal law—is too general to be considered a basis for a condition of confinement claim, because it fails to give Dallas County notice of the state or federal laws with which the jail does not comply. Therefore, plaintiffs' proposed amended complaint does not add an additional theory of liability but only seeks additional relief—compensatory damages—for the § 1983 claim they have already asserted against Dallas County. With this understanding of the scope of the plaintiffs' proposed amendments, the court turns to the Rule 16(b)(4) analysis.

IV

A

Plaintiffs justify the untimely request to amend their complaint based on newly-acquired evidence obtained in deposing defendant Helen Ashley ("Nurse Ashley"), the nurse at the Dallas Jail who dealt with Sims's call for help in November 2005. They maintain that Nurse Ashley revealed for the first time that Dallas County had only one medical professional on duty to care for approximately 3,000 inmates on the night Sims died. In the same deposition, Nurse Ashley also intimated that Dallas Jail staff refuse to follow instruction regarding medical care for inmates because they believe that medical staff are guests in their house: the Dallas Jail. This recently obtained evidence may support plaintiffs' inadequate medical staffing conditions of confinement

claim. But as the court notes *supra* at § III(B), plaintiffs' complaint already states such a claim. Plaintiffs have failed to explain why this recently discovered evidence would now give them reason to add an additional remedy for money damages against Dallas County on a theory of liability that they have asserted from the beginning of this suit. This factor weighs against granting plaintiffs leave to amend.

B

Nevertheless, plaintiffs' proposed amendment—adding a request for money damages from Dallas County on their § 1983 claims—is important to their case. If plaintiffs' episodic act or omission claim against the individual defendants and Dallas County is successful, it is likely that only Dallas County would have the financial resources to satisfy the judgment. Moreover, if plaintiffs prevail only as to their § 1983-based conditions of confinement claim, they would not collect any money damages unless the court grants them leave to amend. Although plaintiffs have not demonstrated good cause for the untimeliness of their proposed amendment, the amendment they seek to make is important to their case.

C

The third and fourth factors both support granting plaintiffs' motion. The prejudice that defendants raise in their opposition brief relates to permitting plaintiffs to state a new conditions of

confinement claim after the expiration of the deadline for designating expert witnesses. But the court has already concluded that plaintiffs' proposed amended complaint states no new theories of liability.

Moreover, this case is not set for trial until March 2009. The discovery deadline has already been extended to October 1, 2008. Permitting plaintiffs to add a request for damages on their § 1983 claims against Dallas County may require Dallas County to conduct additional discovery. But plaintiffs' complaint asserts other claims against Dallas County for money damages under the ADA, the Rehabilitation Act, and chapter 121 of the Texas Human Resources Code. It is not clear that the discovery needed to defend a claim for money damages under § 1983 would be materially (or any) different than the discovery Dallas County has already conducted to defend itself against these other claims for money damages. Nevertheless, if Dallas County can demonstrate that additional discovery is necessary, the court can continue the discovery deadline to allow such discovery to be obtained.

Although the court has concluded that plaintiffs' complaint already pleads a § 1983 conditions of confinement claim, the court also holds that the complaint does not allege this theory of relief with such pellucidity that Dallas County should have known to designate experts to defend it. Therefore, if Dallas County can demonstrate that it needs to designate additional expert witnesses

to defend a conditions of confinement claim, the court will grant the necessary relief to enable the county to do so. Accordingly, granting plaintiffs' motion for leave to amend will not prejudice defendants.

D

Considering the factors *in toto*, the court concludes that there is good cause to permit plaintiffs to amend their complaint after the deadline established by the scheduling order. The court also discerns no compelling reason to deny granting leave under the more liberal Rule 15(a)(2) standard.

\* \* \*

Accordingly, the court grants plaintiffs' June 23, 2008 motion for leave to amend. Plaintiffs must file the first amended complaint—electronically or on paper—within five business days of the date this memorandum opinion and order is filed.

**SO ORDERED.**

August 29, 2008.

                                                              _____
                                                              SIDNEY A. FITZWATER
                                                              CHIEF JUDGE