IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TOSHA SIMS LEE, individually    §
and in her capacity as the      §
representative of the           §
ESTATE OF ROSIE SIMS, et al.,   §
                                §
                    Plaintiffs, §
                                §
VS.                             §  Civil Action No. 3:07-CV-1298-D
                                §
LUPE VALDEZ, in her             §
official capacity               §
as Sheriff of Dallas County,    §
et al.,                         §
                                §
                    Defendants. §

MEMORANDUM OPINION
AND ORDER

In this lawsuit brought under 42 U.S.C. § 1983, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act of 1973 ("Rehabilitation Act"), chapter 121 of the Texas Human Resources Code, and the Texas Wrongful Death Act ("Wrongful Death Act"), Tex. Civ. Prac. & Rem. Code § 71.002 (Vernon 2008), against defendants Dallas County and Sheriff Lupe Valdez ("Sheriff Valdez"), plaintiffs allege that their mother Rosie Sims ("Sims") died while held as a pretrial detainee at the Dallas County Jail ("Dallas Jail") as a result of defendants' failure to provide her with constitutionally adequate medical care and to properly accommodate her mental health disability.[1]  Dallas

_____

[1]On February 12, 2009 the court, by agreement of the parties, dismissed all claims against individual defendants Amber Leonard, Stephanie Fultz, Annette Newhouse, Jennifer Valencia, Desiree Dehorney, and Helen Ashley.  Consequently, the only claims

County and Sheriff Valdez move for summary judgment.  For the reasons that follow, the court grants the motion in part and denies it in part.

                                    I

     The relevant background facts and procedural history of this case are set out in a prior opinion.  *See Lee v. Valdez,* 2008 WL 4130975, at *1-*2 (N.D. Tex. Aug. 29, 2008) (Fitzwater, C.J.) ("*Lee I*").  The court will add to the factual discussion in *Lee I* the facts that are pertinent to deciding the present summary judgment motion.  In doing so, the court recounts the evidence in a light favorable to plaintiffs as the summary judgment nonmovants and draws all reasonable inferences in their favor.  *See, e.g., U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.) (citing *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000)).

     After being diagnosed in 1972 with paranoid schizophrenia, Sims spent the next 30 years in and out of a state hospital.  In February 2002 Sims was detained at the Dallas Jail.  When the Dallas Jail receives a mentally ill detainee whom it cannot adequately treat, it is official policy to send the inmate to a public hospital.  The Dallas Jail also has a special area in which inmates who suffer from mental illnesses are detained (the "West Tower").  When Sims was initially screened in February 2002, a jail

_____

remaining are those against Dallas County and Sheriff Valdez.

                              - 2 -

guard noted that she was "bizarre" and "psychotic."  Despite these observations and the county's extensive documentation of Sims's mental illness, she was neither sent to a public hospital nor to the West Tower, but was instead placed in a part of the Dallas Jail that houses general population inmates (the "North Tower").  Based on a medical expert's recommendation, a state judge soon declared Sims incompetent to stand trial.  The judge sent Sims to a state mental health facility, Vernon State Hospital, where she remained for almost one year before she pleaded guilty to the criminal charge for which she was originally incarcerated.  Because Sims had already served her term of incarceration, she was released.

A few months later (October 2003), Sims was again detained at the Dallas Jail.  Jail officials again assigned her to the North Tower, which houses general population inmates.  A few months later, based on an expert medical opinion, a state judge again declared Sims incompetent to stand trial, and she returned to Vernon State Hospital.

In May 2004 Sims returned to the Dallas Jail to await trial. After conducting another intake evaluation, Dallas Jail officials placed Sims in the general population housed in the North Tower, despite the Jail's notice of Sims's paranoid schizophrenia.  In 2005 Dallas Jail officials received signs of Sims's failing health, but there was no change in the medical attention provided to her.

In November 2005 inmates with whom Sims lived alerted Dallas

Jail guards that she was having a seizure and had fallen out of her bunk.  Three guards responded to the call and observed that Sims was on the floor of her cell.  One guard ordered Sims to get up. Sims told the guard that she wanted to see the nurse, but she needed to change her clothes first because she had soiled them. During the time when Sims sat on her bed and attempted to change her clothes, the three guards heckled and laughed at her, telling her that she was taking too long and that they would not take her to the nurse if she did not hurry up.  Two more guards arrived at Sims's cell, and one of them called a Dallas Jail nurse, who advised the guards to bring Sims to her.  In the meantime, Sims laid back down on her bed, unable to continue changing.  The guards asked her to get up so they could go to the nurse.  Sims responded in an incoherent mumble.  One guard then told the nurse that Sims was just tired, even though that guard had not understood anything Sims had said.  The nurse instructed the guard to bring Sims to her only if Sims wanted to go.  The nurse did not assess Sims's condition, and Sims was not taken to the infirmary.  Sims died hours later of bronchopneumonia in association with cardiac hypertrophy of undetermined etiology.

Tosha Sims Lee, individually and in her capacity as the representative of the estate of Sims, Archie Sims, Jr., and Melissa Lomack sue Dallas County for damages and injunctive relief under the ADA, the Rehabilitation Act, and chapter 121 of the Texas Human

Resources Code.  Plaintiffs allege a claim under 42 U.S.C. § 1983 against Dallas County and Sheriff Valdez in her official capacity for violations of Sims's Fourteenth Amendment rights.  With respect to their § 1983 claim, plaintiffs sue for damages and injunctive relief.[2]  They also assert a claim under the Wrongful Death Act.

Dallas County moves for summary judgment, arguing, *inter alia,* that (1) plaintiffs have failed to establish an actionable claim under § 1983 for denial of medical care; (2) plaintiffs have failed to establish an actionable claim under the ADA or Rehabilitation Act; (3) plaintiffs' § 1983, ADA, and Rehabilitation Act claims are barred by limitations; (4) plaintiffs' claims for declaratory and injunctive relief are barred by the doctrine of mootness; (5) plaintiffs' state-law claims are barred by the doctrine of sovereign immunity; and (6) plaintiffs' state-law claims are barred because plaintiffs failed to provide timely notice of their claims.

II

As a threshold matter, Dallas County and Sheriff Valdez argue that plaintiffs' claims against Sheriff Valdez should be dismissed as a matter of law because they are redundant and unnecessary.  The court agrees.  Plaintiffs sue Sheriff Valdez in her official capacity for injunctive and declaratory relief under § 1983, *and*

---

[2]On August 29, 2008 the court granted plaintiffs' motion to amend their complaint to permit plaintiffs to seek compensatory damages for the § 1983 claim that they had already asserted against Dallas County.  *Lee I,* 2008 WL 4130975, at *5, *7.

Dallas County for, *inter alia,* injunctive and declaratory relief
under § 1983.  A suit against a government official in her official
capacity is "only another way of pleading an action against an
entity of which [the official] is an agent." *Monell v. Dep't of
Soc. Servs. of N.Y.,* 436 U.S. 658, 690 n.55 (1978).   If the
government entity receives notice and an opportunity to respond, an
"official-capacity suit" is treated as a suit against the entity.
*Kentucky v. Graham,* 473 U.S. 159, 166 (1985).   A suit against a
municipal official in her official capacity is not a suit against
the official personally, because the real party in interest is the
entity.  *Id.*  Therefore, plaintiffs' § 1983 claim against Sheriff
Valdez is unnecessarily duplicative of their § 1983 claim against
Dallas County, and it is accordingly dismissed.  *See, e.g., Green
v. City of Irving, Tex.,* 2009 WL 762202, at *1 (N.D. Tex. Mar. 24,
2009) (Fitzwater, C.J.) (dismissing § 1983 claim against police
chief sued in his official capacity where plaintiffs also sued
City).

III

     Before reaching the merits of plaintiffs' § 1983 claim, the
court addresses Dallas County's affirmative defense of limitations.
Dallas County contends that plaintiffs' § 1983 claim[3] is time-

---

[3]Dallas County also posits in the heading sentence of its
argument no. 4, *see* Ds. Br. 14, that plaintiff's ADA and
Rehabilitation claims are also time-barred.  Because Dallas County
does not address plaintiffs' ADA and Rehabilitation Act claims in
the body of its argument, however, the court will not address

barred because neither Dallas County nor Sheriff Valdez was served until after the limitations period had expired, and plaintiffs failed to use reasonable diligence in serving Dallas County and Sheriff Valdez.

A

Because Dallas County will have the burden of proof at trial on this affirmative defense, to obtain summary judgment on this basis it "must establish 'beyond peradventure all of the essential elements of the . . . defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986)).

B

Because Congress has not adopted a statute of limitations for § 1983 actions, the limitations period is determined by reference to the appropriate state statute of limitations and coordinate tolling rules. *Board of Regents, Univ. of N.Y. v. Tomanio,* 446 U.S. 478, 483-84 (1980). In § 1983 actions, district courts apply the forum state's personal injury limitations period. *Moore v. McDonald,* 30 F.3d 616, 620 (5th Cir. 1994). The Texas general personal injury limitations period is two years. *Id.;* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon Supp. 2008). Plaintiffs filed their complaint on July 25, 2007, a few months before the

---

whether these claims are barred by limitations.

limitations period expired.[4]  Under Texas law, however, the mere filing of suit will not toll the statute of limitations.  *See, e.g., Rigo Mfg. Co. v. Thomas,* 458 S.W.2d 180, 182 (Tex. 1970); *Hansler v. Mainka,* 807 S.W.2d 3, 4 (Tex. App. 1991, no writ).  To effect a tolling, a plaintiff must not only file suit within the limitations period but must also exercise due diligence in procuring issuance and service of citation.  *Gant v. DeLeon,* 786 S.W.2d 259, 260 (Tex. 1990); *Zale Corp. v. Rosenbaum,* 520 S.W.2d 889, 890 (Tex. 1975); *Hansler,* 807 S.W.2d at 4.  When a plaintiff files suit within the limitations period, but fails to serve the defendant until after the statutory period has expired, the date of service may relate back to the date of filing if the plaintiff exercises due diligence in effecting service.  *Gant,* 786 S.W.2d at 260; *Hansler,* 807 S.W.2d at 5.

Generally, the exercise of due diligence is a question of fact.  *Taylor v. Thompson*, 4 S.W.3d 63, 65 (Tex. App. 1999, pet. denied); *Hodge v. Smith,* 856 S.W.2d 212, 215 (Tex. App. 1993, writ denied).  But the issue can be determined as a matter of law if no excuse is offered for the failure to timely serve notice of process, or if the lapse of time in the plaintiff's failure to act is such as to conclusively negate diligence.  *Weaver v. E-Z Mart*

---

[4]The parties do not dispute that plaintiffs' § 1983 claim accrued on November 13, 2005, the date of Sims's death. Accordingly, the two-year statute of limitations period expired on November 13, 2007.

- 8 -

*Stores, Inc.,* 942 S.W.2d 167, 169 (Tex. App. 1997, no writ).  If a defendant affirmatively pleads the defense of limitations and shows the failure to timely serve the defendant, "the burden shifts to the plaintiff to explain the delay." *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 830 (Tex. 1990).  If the plaintiff proffers summary judgment evidence that purports to explain the delay, then the defendant must demonstrate that the explanation of diligence is insufficient as a matter of law.  *See Weaver,* 942 S.W.2d at 169 (quoting *Gant*, 786 S.W.2d at 260); *Murray,* 800 S.W.2d at 830; *accord Zale Corp.*, 520 S.W.2d at 891.

Dallas County asserted the affirmative defense of limitations in its answer filed on August 16, 2007, and it reasserted the defense again in its answer to plaintiffs' amended complaint filed on September 8, 2008.  Dallas County argues that, as of the filing of its summary judgment brief on December 5, 2008, plaintiffs have completely failed to effect service of process upon either Dallas County or Sheriff Valdez.  Dallas County submits an affidavit from Dallas County Sheriff's Department's legal advisor and custodian of records, averring that, as of September 24, 2008, Sheriff Valdez, in her official capacity as Sheriff, had not been served with a summons or process in this suit, and an affidavit from a custodian of records for Dallas County Judge Jim Foster and the Dallas County Commissioners Court averring that, as of September 15, 2008, he had found no evidence that the Dallas County Judge had ever been served

with a summons or a copy of the complaint.  Accordingly, the burden
shifts to plaintiffs to explain their alleged failure to effect
service of process on Dallas County.

C

Plaintiffs neither dispute that they failed to effect service
of process on Dallas County nor do they contend or offer any
summary judgment evidence that they diligently tried to serve
Dallas County.  Instead, they maintain that Dallas County has
waived service of process because it has appeared in this case,
filed an answer, and litigated the case for the past 1½ years.
Under Texas law, if the defendant makes a general appearance before
the expiration of the statute of limitations period, the plaintiff
is relieved of the responsibility to serve the defendant with
process.  *See Baker v. Monsanto Co.,* 111 S.W.3d 158, 160 (Tex.
2003) (per curiam) (holding that defendant's general appearance
relieved intervenors of responsibility of serving defendant with
citation); Tex. R. Civ. P. 124 ("In no case shall judgment be
rendered against any defendant unless upon service, or acceptance
or waiver of process, *or upon an appearance by the defendant*
. . . ." (emphasis added)); *Houston Crushed Concrete, Inc. v.
Concrete Recycling Corp.*, 879 S.W.2d 258, 260 (Tex. App. 1994, no
writ) ("An appearance, however unintentional, constitutes a waiver
of service.") (citing *Dodson v. Seymour*, 664 S.W.2d 158, 161 (Tex.
App. 1983, no writ)); *cf. Taylor*, 4 S.W.3d at 66 (holding that

- 10 -

general appearance does not waive service of process where it is filed after the statute of limitations has run and there has been a lack of due diligence in the procurement of citation and service). An answer, moreover, is an appearance under Texas law. *See* Tex. R. Civ. P. 121 ("An answer shall constitute an appearance of the defendant so as to dispense with the necessity for the issuance or service of citation upon him."); *Baker*, 111 S.W.3d at 160 (holding that defendant made general appearance when it answered plaintiffs' complaint). As noted, Dallas County filed its answer on August 16, 2007, before the statute of limitations expired. And although Dallas County filed its answer to plaintiffs' amended complaint after the limitations period expired, the filing relates back to the date of the original answer. *See Kilpatrick v. Estate of Harris*, 848 S.W.2d 859, 865 (Tex. App. 1993, no writ h.) (holding that amended answer relates back to filing of original answer where it does not arise out of a transaction or occurrence that is new or different from plaintiff's cause of action). Therefore, the question is whether Dallas County's answer, which, *inter alia,* raises an affirmative defense of insufficient service of process and denies that the court has subject matter jurisdiction, constitutes a general appearance so as to waive service of process and satisfy the due diligence requirement for tolling the statute of limitations. The court concludes that it does.

Before the Supreme Court of Texas promulgated Tex. R. Civ. P. 120a, any appearance by a nonresident defendant was a general appearance that subjected the defendant to the jurisdiction of the court. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 201 (Tex. 1985) (per curiam) (citing *York v. State*, 11 S.W. 869 (1889)). "Rule 120a altered the *York* rule by allowing a non-resident defendant to make a special appearance 'for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant, *on the ground that such party or property is not amenable to process issued by the courts of this state.'" *Id.* (citing Tex. R. Civ. P. 120a) (emphasis in original)). In all other respects, however, the *York* rule remains unchanged. *Id.* Accordingly, absent a challenge to personal jurisdiction—which obviously would be untenable in this case—an appearance to challenge the plaintiff's failure to properly effect service of process or to challenge the court's subject matter jurisdiction is a general appearance.[5] The procedure of Rule 120a is not applicable. *See Habitech, Ltd. v. Estate of Stout*, 2000 WL 254036, at *3 (Tex. App. Mar. 8, 2000, no pet.) (not designated for

---

[5]"A special appearance motion that appropriately challenges personal jurisdiction is not converted into a general appearance merely because it also challenges the methods of service. Similarly, . . . addressing both [personal and subject matter jurisdiction] in a single motion or hearing is not a general appearance." *In re Marriage of Roman and Gonzalez*, 2007 WL 1378493, at *1 (Tex. App. May 9, 2007, no pet.) (not designated for publication).

publication) ("A special appearance may not be used to challenge the lack of service."); *Laykin v. McFall*, 830 S.W.2d 266, 267 n.1 (Tex. App. 1992, no writ) ("A special appearance may raise the issue of lack of personal jurisdiction but not the issue of lack of subject matter jurisdiction."). Accordingly, Dallas County's answer, which does not (indeed, could not) challenge personal jurisdiction, constitutes a general appearance making personal service unnecessary. *See Baker,* 111 S.W.3d at 160-61 (holding that where defendant answered without questioning the court's in personam jurisdiction, defendant made a general appearance that relieved intervenors of their responsibility to serve defendant); *Golden v. McNeal*, 78 S.W.3d 488, 494-45 (Tex. App. 2002, pet. denied) (holding that defendant's answer constituted an appearance so as to dispense with the necessity of obtaining service of process on him); *Hickey v. Sibley*, 304 S.W.2d 165, 166 (Tex. Civ. App. 1957, no writ)(holding that defendants, who filed an answer subject to their motion to quash citation, were before the trial court for all purposes, and matter of deficiency, if any, in the service and return of the citation was immaterial).[6]   Therefore,

---

[6]Under Texas law, to challenge a plaintiff's failure to properly effect service of process without making a general appearance and waiving the requirement of service, a defendant must file a motion to quash before answering. *See Kawasaki Steel Corp.*, 699 S.W.2d at 202-03 (noting that correct procedure to challenge plaintiff's failure to properly effect service of process is to file Rule 122 motion to quash for defective service, where "[the defendant's] only relief is additional time to answer rather than dismissal of the cause.").

the limitations period was tolled on August 16, 2007, when Dallas County filed its answer.  That date preceded November 13, 2007, when limitations expired.  Dallas County has therefore failed to establish beyond peradventure that plaintiffs' lawsuit is time-barred.

IV

The court now turns to the merits of plaintiffs' § 1983 claim.

A

"Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law." *Colson v. Grohman,* 174 F.3d 498, 504 n.2 (5th Cir. 1999) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 82 (1984)).  "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates.  Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir. 1997) (citations and internal quotation marks omitted) (quoting *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir. 1989)).  Plaintiffs base their § 1983 claim on allegations that the unconstitutional conduct of Dallas County deprived Sims of due process under the Fourteenth Amendment.

Although the state has an important interest in the incarceration of pretrial detainees and convicted state prisoners,

> [t]he State's exercise of its power to hold detainees and prisoners . . . brings with it a

- 14 -

> responsibility under the U.S. Constitution to
> tend to the essentials of their well-being:
> [W]hen the State by the affirmative exercise
> of its power so restrains an individual's
> liberty that it renders him unable to care for
> himself, and at the same time fails to provide
> for his basic human needs . . . it
> transgresses the substantive limits on state
> action set by the Eighth Amendment and the Due
> Process Clause.

*Hare v. City of Corinth, Miss.,* 74 F.3d 633, 638-39 (5th Cir. 1996)

(en banc) (first brackets added) (quoting *DeShaney v. Winnebago*

*County Dep't of Soc. Servs.,* 489 U.S. 189, 200 (1989)).  A pretrial

detainee's constitutional rights stem from "both the procedural and

substantive due process guarantees of the Fourteenth Amendment."

*Id.* at 639 (citing *Bell v. Wolfish,* 441 U.S. 520, 535 (1979)).

Under the Fourteenth Amendment Due Process Clause, confinement of

a pretrial detainee may not be punitive, because for pretrial

detainees, there has not yet been an adjudication of guilt.  *See*

*Bell,* 441 U.S. at 535.  Because Sims was a pretrial detainee, the

inquiry in this case regarding plaintiffs' § 1983 claim focuses on

whether Dallas County's actions amounted to a violation of Sims's

Fourteenth Amendment due process rights.

    To determine the appropriate standard to apply in analyzing

constitutional challenges brought by pretrial detainees under §

1983, the Fifth Circuit has directed courts first to classify the

challenge as an attack on a "condition of confinement" or as an

"episodic act or omission."  *Flores v. County of Hardeman, Tex.,*

124 F.3d 736, 738 (5th Cir. 1997) (citing *Hare,* 74 F.3d at 644).

In a condition of confinement case, the constitutional challenge is to the "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare,* 74 F.3d at 644. By contrast, in an "episodic act or omission" case, the complained-of harm is a particular act or omission of one or more officials, and the case focuses on "whether [the] official breached his constitutional duty to tend to the basic human needs of persons in his charge." *Id.* at 645; *Johnson v. Johnson County,* 2006 WL 1722570, at *3 (N.D. Tex. June 21) (Fitzwater, J.), *appeal dism'd,* No. 06-10762 (5th Cir. Oct. 13, 2006). A party alleging that an "episodic act or omission" resulted in an unconstitutional violation of a pretrial detainee's Fourteenth Amendment rights is required to show that the official's action constituted "deliberate indifference." *Hare,* 74 F.3d at 647-48.

Although plaintiffs' complaint appears to allege both an episodic act or omission theory and a condition of confinement theory,[7] in their summary judgment response, plaintiffs characterize their § 1983 claim as only a conditions of confinement claim. *See, e.g.,* P. Br. 13 ("Plaintiffs have Pleaded a Conditions

---

[7]Dallas County argues that the court should analyze plaintiffs' claims exclusively under the episodic acts or omissions framework because, by setting forth with particularity the alleged acts and omissions of individuals, "the gravamen of the Plaintiffs' pleadings complain first of acts or omissions by particular actors." Ds. Reply Br. 4. This court has already held in *Lee I*, however, that plaintiffs have sufficiently alleged a § 1983 conditions of confinement claim against Dallas County. *Lee I*, 2008 WL 4130975, at *5.

of Confinement Claim"); *id.* at 14–15 (distinguishing this case from "episodic acts or omission" cases); *id.* at 22 ("Plaintiffs need not establish deliberate indifference on the part of Dallas County to prevail in this case" because in conditions of confinement actions, a showing of deliberate indifference is not required). Consequently, the court will analyze plaintiffs' § 1983 claim exclusively under the conditions of confinement framework.

B

In a § 1983 condition of confinement case, the pretrial detainee attacks the general conditions, practices, rules, or restrictions of pretrial confinement, and courts apply the test that the Supreme Court announced in *Bell.* *See Hare,* 74 F.3d at 644. The *Bell* test is designed to "determin[e] whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word." *Bell,* 441 U.S. at 538. It requires a court to decide whether "the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* (citing cases).

To determine whether the condition is an unconstitutional punishment, the court asks whether the "particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective." *Id.* at 539. If it is, the condition or restriction does not amount to unconstitutional

- 17 -

"punishment." *Id.* "Conversely, if a restriction or condition is not reasonably related to a legitimate goal——if it is arbitrary or purposeless——a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* Unlike an episodic act or omission claim, a condition of confinement claim involves no independent inquiry into the jail officials' state of mind, such as whether they acted with "deliberate indifference." *Palo v. Dallas County,* 2007 WL 2140590, at *2 (N.D. Tex. July 26, 2007) (Fitzwater, J.) (citing *Hare,* 74 F.3d at 643; *Grabowski v. Jackson County Pub. Defenders Office,* 47 F.3d 1386, 1398 (5th Cir. 1995)). This is because the conditions perpetuated by jail officials "manifest[ ] an avowed intent to subject a pretrial detainee" to those conditions. *Hare,* 74 F.3d at 644; *see also id.* ("[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices."). Thus the inquiry in a condition of confinement case begins with the presumption that intent exists and applies the test articulated in *Bell,* upholding the condition or restriction only if it is reasonably related to a legitimate governmental objective. *Id.* at 644-45; *Bell,* 441 U.S. at 539.

C

1

Dallas County contends that plaintiffs have failed to produce sufficient evidence to show that Sims was denied her constitutional right to medical treatment.  Specifically, Dallas County posits that there is no evidence that Sims received an inadequate level of medical care as a result of general conditions of confinement in the Dallas Jail that constituted inhumane treatment or punishment; there is no evidence that Dallas County officials were aware that the level of medical care in the Dallas Jail was inadequate, let alone that it constituted inhumane treatment or punishment of Sims; there is no evidence that the level of medical care provided to Sims in the Dallas Jail was not related to a legitimate governmental objective; and there is no evidence that the general conditions of confinement were the cause-in-fact of Sims's death.

Where, as here, Dallas County will not have the burden of proof on this claim at trial, it may meet its summary judgment obligation by pointing the court to the absence of evidence to support plaintiffs' claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once it does so, plaintiffs must go beyond their pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). Plaintiffs' failure to produce proof as to any essential element renders all other facts immaterial. *Trugreen Landcare, L.L.C. v.*

*Scott,* 512 F.Supp.2d 613, 623 (N.D.Tex. 2007) (Fitzwater, J.) (citing *Edgar v. Gen. Elec. Co.,* 2002 WL 318331, at *4 (N.D. Tex. Feb. 27, 2002) (Fitzwater, J.)).   An issue is genuine if the evidence is such that a reasonable jury could return a verdict in plaintiffs' favor.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment is mandatory if plaintiffs fail to meet this burden.  *Little,* 37 F.3d at 1076.

2

In opposing summary judgment, plaintiffs introduce various documents, including a 2005 report by the consulting firm Health Management Associates ("HMA Report") and a 2006 report by the Department of Justice ("DOJ Report").[8]

In December 2004 the Dallas County Commissioners Court contracted with Health Management Associates to perform a comprehensive review of the medical and mental health services at the Dallas Jail. Michael Puisis, M.D. ("Dr. Puisis") performed the onsite analysis and prepared the HMA Report.   The HMA Report

---

[8]Dallas County filed on January 14, 2009 objections and a motion to strike exhibits contained in plaintiffs' response.   It objects to both reports for essentially the same reasons it did in *Palo.  See Palo,* 2007 WL 2140590, at *7-*9.  The court overrules the objections on the same grounds.  *See id.*  Dallas County also objects to other exhibits (specifically exhibits A, B, E-G, P, R-X) included in plaintiffs' evidence appendix.   Because the court concludes, without considering the balance of these exhibits, that plaintiffs have met their summary judgment burden, it need not decide any of Dallas County's objections that are not addressed in *Palo.*  Accordingly, the court otherwise overrules the objections and motion to strike exhibits as moot.

revealed systemic failures in the medical care provided at the Dallas Jail, including the fact that intake screening at the Jail, which "should include both arrival screening and intake physical examinations," is "ineffective." Ps. App. 104-05. Dr. Puisis observed:

> There is no one assigned to the intake screening process licensed to diagnose either medical or mental health conditions. In this respect, there is *no* capacity to diagnose illness at intake. The screening process exists not to identify disease but to assign housing to inmates. To a certain extent, nurses make referrals and some patients are referred to Parkland Hospital, to mental health and to the infirmary. Many inmates do not have their chronic illness identified through the intake process. For those whose condition is identified, the subsequent evaluation of the status of their disease is dependent on nurses in the housing units. Follow up evaluation seldom occurs by a physician; this only occurs if a second nurse on the housing unit refers the patient to a physician. Significant numbers of persons with clinical conditions never receive an evaluation by a clinician other than a nurse.

Ps. App. 109-110. The system of inmate written requests for medical treatment was also found to be inadequate, and although correctional health standards require that these requests be evaluated within 24 hours, Dr. Puisis observed that nurses were staffed to evaluate them only two days a week. *Id.* at 113. There were, he reported, "multiple barriers to inmate access" to clinical evaluations by a nurse, *id.*, and many more inmates were scheduled for evaluation than the nurses have time to see. *Id.* Dr. Puisis

further observed that emergency responses at the Dallas Jail appear
to be of two types: (1) officers call nurses for an emergency, all
clinical activity in the clinic stops and the nurse responds to the
emergency; (2) officers call a nurse about a problem with a
particular inmate that is seen as important but not as important as
a crisis.  *Id.* at 114.  "[B]ecause officers are not expertly
trained in medical evaluation," however, "the exact nature of the
problem [i.e. a true emergency or an important but not immediately
urgent problem] is never entirely clear."  *Id.*

> These evaluations necessitate insertion of
> evaluations into a system which is already
> backlogged and nurses attempt, with the time
> available, to address these "emergency"
> requests as soon as they are able. I was told
> that nurses cannot see these "emergency"
> patients every day but try to catch up with
> them by the end of the week.

*Id.*

The Department of Justice ("DOJ") conducted onsite inspections
of the Dallas Jail on February 20-24, 2006 and March 20-23, 2006.
The DOJ found the results of its investigation to be consistent
with the findings in the HMA Report, and concluded that the Dallas
Jail had violated the inmates' constitutional rights to medical
care.  *Id.* at 154.  It found, *inter alia,* that Dallas County "fails
to adequately identify inmates' health needs through appropriate
intake screening, thereby preventing inmates from receiving
adequate care for acute or chronic needs."  *Id.*  "Prior to March 1,
2006, detention officers, who lacked adequate training and medical

supervision, were responsible for conducting intake screening."
*Id.*   Although Dallas County began using paramedics to perform
intake screenings on March 1, 2006, "the intake screening process
remains deficient because there are no medical policies governing
the intake process, and signs and symptoms of serious illness or
contagious disease go unrecorded."  *Id.* at 154-55.  Furthermore,
although the generally accepted correctional medical standard is to
conduct health assessments (which include a review of the intake
information, a complete medical and mental health history, a
physical examination, and a screening for TB and sexually
transmitted diseases) within two weeks of admission, the DOJ found
that Dallas County "inmates do not receive a full health assessment
within a reasonable period after admission." *Id.* at 156.  DOJ also
determined that Dallas County "fails to provide inmates adequate
acute care, that is care for urgent and/or emergent medical
conditions." *Id.* "Most seriously, [DOJ] found numerous instances
where [Dallas County's] mismanagement contributed to preventable
deaths, hospitalizations, and unnecessary harm." *Id.* at 156-57.

In addition to proffering the foregoing reports as summary
judgment evidence, plaintiffs, relying in part on these reports and
on other evidence, have also identified four specific inadequacies
at the Dallas Jail that allegedly denied Sims access to medical
care and ultimately resulted in her death.  First, because of the
Dallas Jail's ineffective intake screening process, a medical

professional did not see Sims when she first arrived at the Jail in
May 2004 to determine whether she had any medical problems.
Despite being on notice that Sims was a 60-year old woman with a
serious mental illness, Dallas County did not give Sims a physical
in the 1½ years she spent in the Dallas Jail.

Second, because mental health records are not incorporated
into medical records, and because medical and mental health staff
personnel do not always coordinate their work together, *see id.* at
118-19, Nurse Helen Ashley ("Nurse Ashley"), a member of the
medical staff on duty the night Sims died, was unaware that Sims's
mental health records indicated that she had an "asthma attack"
several days before her death. *Id.* at 623-24. Consequently, that
information was not factored into the jail officers' decision not
to take Sims to the infirmary following her seizure on the night of
her death.

Third, Dallas County allowed its officers, who have no medical
training, to make medical decisions, such as determining which
inmates need medical attention. *Id.* at 114. And each of the
individual officers responsible for supervising Sims on the night
of her death testified that the officer had no training in
recognizing inmates' medical problems. *Id.* at 361, 410-11, 483,
542, and 595. Consequently, after Sims suffered a seizure just
hours before her death, one officer observed her behavior and
reported to the nurse that Sims was just tired. *Id.* at 433. Nurse

Ashley instructed the officer to bring Sims to her only if Sims wanted to go. *Id.* at 626. Nurse Ashley did not assess Sims's condition, and Sims was not taken to the infirmary. *Id.* at 624, 627.

Fourth, plaintiffs posit that Dallas County failed to provide adequate staffing at the Dallas Jail. The HMA Report states that the "infirmary staff is grossly understaffed and does not include a physician who is in charge of this unit . . . . The existing arrangements create liability concerns and are dangerous." *Id.* at 120. On the night Sims died, Nurse Ashley, a licensed vocational nurse, was the only medical provider on duty to care for over three thousand inmates. *Id.* at 617.

3

Based on the foregoing, the court concludes that plaintiffs have adduced sufficient evidence to enable a reasonable jury to find that Sims was deprived of adequate medical care due to the conditions of her confinement. Specifically, a reasonable jury could find that the medical care provided at the Dallas Jail suffered from various inadequacies, including inadequate staffing, inadequate intake screening, ineffective communication between the mental health and medical personnel, and inadequate responses to requests for treatment. The jury could also reasonably find, based on the evidence of Sims's own experience at the Dallas Jail, *see supra* § I, that she was subjected to these inadequate medical

conditions while she was a pretrial detainee.  Moreover, the court
holds that a reasonable jury could find that the inadequate medical
conditions of which plaintiffs complain were not reasonably related
to a legitimate government purpose.  Therefore, a reasonable jury
could find under the *Bell* standard that the conditions to which
Sims was subjected "punished" Sims, in violation of her Fourteenth
Amendment rights.  *Bell*, 441 U.S. 538-39.  Indeed, as this court
stated in *Shepherd v. Dallas County, Texas,*

> if the summary judgment evidence that this
> court has reviewed in [*Palo*, 2007 WL 2140590,
> at *7-*11,] and the present case is
> corroborated at trial, a reasonable jury could
> easily find that at least some aspects of the
> medical care provided at the Dallas County
> Jail [are] shockingly inadequate, to the point
> that it deserves the strongest of rebukes.

*Shepherd v. Dallas County, Tex.*, 2008 WL 656889, at *7 (N.D. Tex.
Mar. 6) (Fitzwater, C.J.), *appeal docketed*, No. 08-10918 (5th Cir.
Sept. 18, 2008).

V

Plaintiffs allege that Dallas County violated Sims's rights
under Title II of the ADA and § 504 of the Rehabilitation Act by
failing to accommodate her mental disability.  Specifically, they
assert that Dallas County failed to accommodate Sims's disability
by placing her in a general population housing, despite knowledge
of her mental disability, denying her treatment while she was
awaiting trial, failing to provide adequate medical care during the

entirety of her stay in the Dallas Jail, failing to provide employees with training regarding mentally ill inmates, and failing to provide her with medical care on the night of her death.

A

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  A "program or activity" includes "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . ."  29 U.S.C. § 794(b)(1)(A).

Congress intended that Title II "work in the same manner as Section 504," *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (internal quotation marks and citation omitted), and jurisprudence

interpreting either statute is generally applicable to both, *id.* To prove a claim under Title II or § 504, plaintiffs must show that Sims (1) was a qualified individual with a disability, and (2) was excluded from participation in or denied the benefits of the services, programs, or activities of the Dallas Jail, or was otherwise subjected to discrimination by the Dallas Jail, (3) because of her disability. *See id.*

Dallas County does not dispute that Sims was a qualified individual with a disability. Instead, Dallas County posits that there is no evidence that Sims was excluded from participating in some benefit at the Dallas Jail or that such exclusion was due to discrimination solely on account of a disability. Dallas County also contends that there is no evidence that any such benefits were part of a program or activity receiving federal financial assistance.

B

Although the language of Title II generally tracks that of § 504, the protections of § 504 are more limited than those of Title II. *See id.* ("Congress' intent was that Title II extend the protections of the Rehabilitation Act to cover all programs of state or local government, regardless of the receipt of federal financial assistance" (internal quotation marks and citation omitted)). Under the Rehabilitation Act, plaintiffs are required to show that Dallas County receives federal financial assistance.

Although plaintiffs have alleged in their complaint that Dallas County receives such assistance, *see* Compl. ¶ 42, Dallas County has pointed to the absence of evidence that it or any of its programs receives federal financial assistance.  Consequently, to survive summary judgment on their § 504 claim, plaintiffs must go beyond their pleadings and designate specific facts showing there is a genuine issue for trial regarding Dallas County's receipt of federal financial assistance.  *See Celotex,* 477 U.S. at 324. Because plaintiffs have not pointed to any evidence indicating Dallas County's receipt of such assistance, they have failed to meet their burden, and the court accordingly grants summary judgment for Dallas County on plaintiffs' § 504 claim.  *See Marlor v. Madison County, Idaho*, 50 Fed. Appx. 872, 873 (9th Cir. 2002) (affirming district court's granting of summary judgment on plaintiff's § 504 claim where plaintiff did not demonstrate that County Jail received federal financial assistance).

C

The court now considers plaintiffs' claim under Title II. Plaintiffs first contend they do not have to show that Dallas County excluded Sims from participating in some benefit at the Dallas Jail.  The court agrees.[9]  Plaintiffs can prove their Title

---

[9]The court notes, however, that its agreement is not based on the cases that plaintiffs cite.  Plaintiffs rely on *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998), and *United States v. Georgia*, 546 U.S. 151 (2006), to support the proposition that they do not have to show that Sims was excluded

II claim by showing *either* that Sims was excluded from participating in some benefit at the Dallas Jail *or* that she was otherwise subjected to discrimination by the Jail. *See Hainze*, 207 F.3d at 799 ("A disabled plaintiff can succeed in an action under Title II if he can show that, by reason of his disability, he was either excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or otherwise subjected to discrimination by any such entity." (internal quotation marks and citations omitted)); 42 U.S.C. § 12132 (Title II) ("no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such entity.").

---

from some benefit, but neither case provides such support.  The excerpt from *Yeskey* that plaintiffs cite is inapposite; it addresses the unrelated issue whether prisoners are excluded from Title II's definition of a "qualified individual with a disability." *See Pa. Dep't of Corrs.*, 524 U.S. at 210-11 (holding that Title II covers inmates in state prisons).  And although plaintiffs contend that the Title II plaintiff in *United States v. Georgia* did not argue that he was denied access to a program, service, or benefit, the plaintiff in fact made such an argument. *See United States v. Georgia*, 546 U.S. at 155 ("He [the prisoner plaintiff] also claimed that he had been denied physical therapy and medical treatment, and denied access to virtually all prison programs and services on account of his disability."). Furthermore, while plaintiffs suggest that an exclusion-from-benefits claim is somehow distinct from the one made by the plaintiff in *United States v. Georgia*──i.e., that prison officials failed to provide him with accommodations when he was unable to use the toilet and shower, and he was forced to sit in his own excrement while prison officials refused to assist him──the Supreme Court held, to the contrary, that a refusal to accommodate a prisoner's fundamental needs can constitute a denial of prison benefits or services.  *See id.* at 157.

Nevertheless, the fact that plaintiffs are not required to show that Dallas County excluded Sims from participating in some benefit at the Jail has little impact on the court's analysis. Plaintiffs allege that Sims was discriminated against under Title II because she was denied reasonable accommodations for her serious mental disabilities to allow her to access health care in the Dallas Jail. But this alleged refusal to accommodate Sims's mental health needs constitutes a denial of the Dallas Jail's benefits or services. *See United States v. Georgia*, 546 U.S. 151, 157 (2006) ("[I]t is quite plausible that the alleged deliberate refusal of prison officials to accommodate [plaintiff's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted exclusion from participation in or denial of the benefits of the prison's services, programs, or activities." (internal quotation marks, brackets, ellipsis, and citation omitted)); *see also Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) (noting that phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs). Therefore, although plaintiffs need not show that Dallas County excluded Sims from participating in some benefit at the Dallas Jail, and they can prove their Title II claim through evidence showing that Sims was otherwise subjected to discrimination, in the present case these two predicates for relief

essentially fold into one, because plaintiffs' allegations of discrimination also constitute assertions that she was excluded from the Dallas Jail's services and programs.

The question therefore becomes whether there is any summary judgment evidence that would enable a reasonable jury to find that Dallas County refused to reasonably accommodate Sims's mental health needs[10]——thereby denying Sims the benefit of the Dallas Jail's services——and that this refusal was due to discrimination based on account of Sims's disability.

D

Dallas County argues that the summary judgment record is devoid of evidence showing that Sims was excluded from receiving medical or psychiatric care, let alone that the exclusion was due solely to her disability. Dallas County contends that upon being booked into the Dallas Jail, Sims was placed in a behavioral observation tank for closer observation and supervision by the jail medical staff, and that, during her confinement, she received both medical and psychiatric treatment.

Plaintiffs have pointed to evidence, however, that the behavior observation units in which Sims was confined are "not

---

[10]The ADA and the Rehabilitation Act do not require public entities to "guess" that an individual needs accommodating. *See, e.g., McCoy v. Tex. Dep't of Criminal Justice,* 2006 WL 2331055, at *7-*8 (S.D. Tex. Aug. 9, 2006) (citing cases). Here, Dallas County does not dispute that it knew of Sims's disability and need for accommodation.

supervised in any meaningful way and not under any type of clinical control."  Ps. App. 126 (HMA Report).   "There is no group or special therapy on the units.  They are merely additional cells in proximity to mental health offices."  *Id.*  Plaintiffs have also presented ample evidence that would enable a reasonable jury to find that the quality of medical care at the Dallas Jail during the time Sims was confined there[11] was shockingly inadequate.  *See supra* § IV(C)(2).  Moreover, it is undisputed that Sims was never given a physical in the 1½ years that she was detained at the Dallas Jail.  And on the night of her death, after she suffered a seizure, jail officers did not take her to the infirmary despite the fact that she was mumbling incoherently and that the officers could not understand her.  Therefore, plaintiffs have presented sufficient evidence to enable a reasonable jury to find that Sims was excluded from receiving adequate medical care.

"Inadequate medical care," however, "does not provide a basis for an ADA claim unless medical services are withheld *by reason of* a disability."  *Marlor*, 50 Fed. Appx. at 873 (holding that plaintiff's Title II claim did not survive summary judgment where plaintiff failed to raise genuine issue of material fact that he was denied medical equipment *because of* his disability).  Here,

---

[11]Sims was confined in the Jail from May 2004 until her death in November 2005.  The inspections that backed the HMA Report were conducted during Sims' confinement in late 2004 or early 2005, and the DOJ inspections that backed the DOJ Report were conducted in February and March 2006, a few months after Sims' death.

plaintiffs have offered no evidence to show that Sims was denied adequate medical care *because of* her mental disability.  Indeed, their evidence would only permit a reasonable jury to find that *all* detainees——not just those with a disability——were denied adequate medical care, and it strongly suggests that Sims was denied adequate medical care for reasons (such as inadequate funding of detainee medical care) that were not based on her disability.  *See, e.g., Anderson v. Dallas County, Tex.,* 2007 WL 1148994, at *10-*11 (N.D. Tex. Apr. 18, 2007) (Fish, C.J.) (granting summary judgment on plaintiff's Title II and § 504 claims where plaintiff had submitted, *inter alia,* the HMA Report as evidence, but had "offered no evidence that Dallas County denied any medical service to mentally ill prisoners in general, or to [plaintiff] specifically, while providing treatment to those prisoners who were not mentally ill"); *Winters v. Ark. Dep't of Health & Human Servs.*, 491 F.3d 933, 937 (8th Cir. 2007) (holding that plaintiff was not discriminated against on basis of disability where he was returned to county jail, not on the basis of his disability, but for lack of available space in state hospital).

Therefore, the court grants Dallas County's motion for summary judgment and dismisses plaintiffs' Title II claim.

VI

Plaintiffs seek declaratory relief under all their claims and

injunctive relief against Dallas County under § 1983,[12] Title II, § 504, and chapter 121.   Dallas County maintains that plaintiffs' claims for declaratory and injunctive relief are rendered moot by Sims's death.[13]

The court holds that plaintiffs' request for prospective injunctive and declaratory relief is mooted by Sims's death.   To satisfy the "case or controversy" requirement of Article III, a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-102 (1983) (internal quotation marks and citations omitted).   "Past exposure to illegal

_____

[12]In their complaint, plaintiffs seek injunctive relief against Sheriff Valdez in her official capacity under § 1983.   Because the court has dismissed plaintiffs' claims against Sheriff Valdez in her official capacity as duplicative of their claims against Dallas County, *see supra* § II, it will construe plaintiffs' claim for injunctive relief under § 1983 to be against Dallas County alone.

[13]Plaintiffs maintain that they have standing to pursue their claims because the ADA and the Rehabilitation Act allow them to assert the rights of third parties.   Such an argument, however, is not responsive to Dallas County's contention that plaintiffs' claims for injunctive and declaratory relief are moot.   While the doctrines are related, standing and mootness are separate inquiries.   *See, e.g., Palo ex rel. Estate of Palo v. Dallas County*, 2006 WL 3702655, at *8 (N.D. Tex. Dec. 15, 2006) (Fitzwater, J.).   Assuming *arguendo* that plaintiffs have standing to assert the rights of third parties, the matter would nonetheless be moot if the issue presented——i.e., is Dallas County violating the civil rights of the third party?——is no longer live.   *See Supreme Beef Processors, Inc. v. U.S. Dep't of Agric.*, 275 F.3d 432, 436 (5th Cir. 2001).

conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974). Courts therefore hold, for example, that when a prisoner challenges prison conditions after he is released from confinement, his claim for injunctive and/or declaratory relief is moot, and the prisoner can no longer challenge the prison conditions unless he can point to a concrete and continuing injury. *See, e.g., Spencer v. Kemna,* 523 U.S. 1, 7 (1998) ("Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained."); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (holding that request for injunctive and declaratory relief becomes moot when inmate leaves the complained-of prison facility); *see also Pitre v. David Wade Corr. Ctr.*, 2008 WL 466160, at *3 (W.D. La. Feb. 14, 2008) (noting that plaintiff's claims for declaratory and injunctive relief under Title II were rendered moot by his transfer to another prison facility). Similarly, the death of a prisoner renders a claim for prospective injunctive relief against the prison conditions moot. *See Bowman v. Corr. Corp. of Am.,* 350 F.3d 537, 550 (6th Cir. 2003) ("Given the fact that [the prisoner] is dead, any claim for injunctive relief is moot . . . ."). Although there may be rare instances

where a court holds that a case involving a deceased prisoner is not moot, either because it is a class action or because it is "capable of repetition yet evading review," *Kremens v. Bartley,* 431 U.S. 119, 133 (1977); *County of Riverside v. McLaughlin,* 500 U.S. 44 (1991), plaintiffs have presented no evidence that Sims's case fits into one of these categories.   Even if plaintiffs can establish at trial that they are entitled to recover damages, their request for prospective declaratory and injunctive relief related to Sims is moot in light of her death.   Accordingly, these claims for relief are dismissed without prejudice.

VII

Dallas County contends that plaintiffs' state-law claims brought under Tex. Hum. Res. Code § 121.003(d)(3) (Vernon 2001)[14] and the Texas Wrongful Death Act are barred by the doctrine of sovereign or governmental immunity.[15]   Because plaintiffs maintain that the only state-law claims they are bringing are pursued under the Wrongful Death Act and Survival Statute, *see* Ps. Br. 30 ("Plaintiffs' only state law claims are brought under the Texas Wrongful Death Act and Survival Statute."), the court concludes that plaintiffs have abandoned the § 121.003(d)(3) claim alleged in

---

[14]Section 121.003(d)(3) provides that "[t]he discrimination prohibited by this section includes . . . a failure to . . . provide auxiliary aids and services necessary to allow the full use and enjoyment of the public facility."

[15]Dallas County does not contend that the doctrines of sovereign and governmental immunity bar plaintiffs' federal claims.

their complaint, *see* Compl. ¶¶ 45-46, and accordingly dismisses this claim.

Regarding the Wrongful Death Act and Survival Statute claims, plaintiffs maintain that "[t]hese claims are procedural, not substantive," and that they rely on the Wrongful Death Act and Survival Statute only to establish their standing to sue Dallas County for § 1983 civil rights violations. Ps. Br. 30. Therefore, the court deems plaintiffs' claims under the Wrongful Death Act and Survival Statute to be procedural only, and it dismisses them only to the extent they can be construed as asserting separate substantive claims for relief.[16]

---

[16]Because the court is dismissing plaintiffs' state-law claims for these reasons, it need not address Dallas County's argument that plaintiffs' state-law claims are barred for failure to provide timely notice or by the doctrines of sovereign or governmental immunity.

*     *     *

For the foregoing reasons, Dallas County's December 5, 2008 motion for summary judgment is granted in part and denied in part. Dallas County's January 14, 2009 objections and motion to strike exhibits contained in plaintiffs' response are denied.

**SO ORDERED.**

May 20, 2009.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

– 39 –